IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ADA CORDERO, *et al.*

CRIMINAL CASE NO.

1:11-cr-00009-ODE-RGV

**ORDER FOR SERVICE OF MAGISTRATE JUDGE'S
FINAL REPORT AND RECOMMENDATION**

Attached is the Final Report and Recommendation of the United States
Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and Local Criminal
Rule 59(2)(a)-(b).  Let the same be filed and a copy, with a copy of this Order, be served
upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any,
to the Report and Recommendation within fourteen (14) days of receipt of this Order.
Should objections be filed, they shall specify with particularity the alleged error(s)
made (including reference by page number to the transcript if applicable) and shall be
served upon the opposing party.  The party filing objections will be responsible for
obtaining and filing the transcript of any evidentiary hearing for review by the District
Court.  Failure to object to this Report and Recommendation waives a party's right to
review.  Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED**, this 13th day of September, 2011.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ADA CORDERO, *et al.*

CRIMINAL CASE NO.

1:11-cr-00009-ODE-RGV

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Defendants Gabriel Payamps ("Payamps") and Silvia Espinoza-Manon ("Espinoza-Manon") are charged along with six co-defendants[1] in a twelve count indictment.  Payamps is charged with conspiring to knowingly and intentionally possess with intent to distribute cocaine and methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846, and with attempting to possess with intent to distribute methamphetamine and possessing with intent to distribute cocaine in

_____

[1] The co-defendants are Ada Cordero ("Cordero"), Jose Reyes ("Reyes"), Alejandro Gomez-Garcia ("Gomez-Garcia"), Cleymi Manon, Moises Zapata ("Zapata"), and David Garcia-Hernandez ("Garcia-Hernandez").  See [Doc. 1 at 1]. Reyes has also filed motions to suppress evidence and statements in this case, [Docs. 86 & 87]; however, these motions have been addressed in a separate Report and Recommendation issued on August 29, 2011.  See United States v. Rosario, Criminal Action File No. 1:11-cr-060, at [Doc. 65], (N.D. Ga. Aug. 29, 2011).  Cordero also filed a motion to suppress evidence, [Doc. 57], and was ordered to perfect that motion by April, 15, 2011, [Doc. 93.].  Cordero has not perfected the motion, and it is therefore **RECOMMENDED** that it be deemed abandoned and **DENIED**.  United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1327 n.3 (N.D. Ga. 2009), adopted at 1326.

violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and 18 U.S.C. § 2.  [Doc. 1].   Espinoza-Manon is charged with possessing with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) and 18 U.S.C. § 2.  [Id.].  Both Payamps and Espinoza-Manon are also charged with attempted Hobbs Act robbery in violation of 18 U.S.C. §§ 1951(a) and  2, and with conspiring to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a).  [Id.].

Payamps has moved to suppress evidence obtained using state wiretaps, [Doc. 102], and evidence obtained following traffic stops on July 3 and July 10, 2009, [Doc. 108].  Payamps has also filed a motion to suppress statements he made in response to allegedly unlawful interrogation by law enforcement. [Doc. 103]. Espinoza-Manon has filed a motion to suppress statements she made to law enforcement authorities, [Doc. 90], and a motion to suppress evidence seized from her home, [Doc. 89].  Following an evidentiary hearing, the parties have briefed the issues raised by the motions, see [Docs. 109, 118, 120, 129,  133, & 139], and the motions are ready for ruling.[2]  For the

---

[2] See [Doc. 113] for a transcript of the April 20, 2011, evidentiary hearing regarding the search of Espinoza-Manon's residence, and [Doc. 122] for a transcript of the May 31, 2011 evidentiary hearing related to Payamps' motions.  In addition, the government submitted exhibits at the hearings, which will be referred to as "(Gov. Ex. 113-___)" for exhibits introduced during the hearing on Espinoza-Manon's motions and "(Gov. Ex. 122-___)" for exhibits introduced during the hearing on Payamps' motions. Espinoza-Manon has submitted a post-hearing brief, [Doc. 128], and an amended post-hearing brief, [Doc. 129].  As she has timely filed both, the Court will consider the arguments presented in the amended post-hearing brief, [Doc. 129], and consider the later-filed brief to have superseded the original

following reasons, it is hereby **RECOMMENDED** that Payamps' and Espinoza-Manon's motions to suppress evidence and statements, [Docs. 89, 90, 102, 103, & 108], be **DENIED.**[3]

## I.  STATEMENT OF FACTS

### A.  Wiretap Evidence

Sergeant Edward Restrepo ("Sergeant Restrepo") of the Gwinnett County Police Department ("GCPD"),[4] testified that Payamps was one of the targets of a narcotics and armed robbery investigation in which he was involved, and that he knew Payamps by the aliases "Cali, Caliman, and Comandante."  [Doc. 122 at 15-16]  Sergeant Restrepo testified that Corporal Scott Kannigiser ("Corporal Kannigiser") obtained an order from the Superior Court of Gwinnett County authorizing the use of wiretaps in the case after investigators had been noticing a pattern of home invasion robberies involving drug trafficking organizations in which Cordero's name "came up on the

---

post-hearing brief, [Doc. 128].

[3] The government has stated that it does not intend to use any statements made by Espinoza-Manon except for those related to her consent to search her residence, which are addressed hereinafter and are not challenged by Espinoza-Manon.  <u>See</u> [Doc. 113 at 3]; [Doc. 120 at 3];  <u>see also</u> [Docs. 128 & 129 (Espinoza-Manon's briefs failing to address any issue related to suppression of statements)].  Accordingly, it is **RECOMMENDED** that Espinoza-Manon's motion to suppress statements, [Doc. 90], be **DENIED** as moot.

[4] Sergeant Restrepo testified that he has worked for GCPD since May 10, 1997. [Doc. 122 at 15].

radar over several years."  [Id. at 16].  Sergeant Restrepo stated that an undercover officer and confidential informants allowed GCPD officers to obtain enough information to get the wiretap orders prior to July 10, 2009.  [Id. at 16-17].  One of the defendants whose conversations were intercepted on the wiretap was Payamps.  [Id. at 17].

## B.  The July 3, 2009, Traffic Stop

On July 3, 2009, Officer Kevin Sipple ("Officer Sipple") of GCPD was on patrol when Sergeant Restrepo requested that he investigate a suspicious vehicle parked in an area near Pleasant Hill Road.  [Id. at 5, 17].  Sergeant Restreppo asked Officer Sipple to find probable cause to stop the vehicle and identify the occupants.[5]  [Id. at 6-7, 17]. Officer Sipple located the vehicle, a Mercury Mountaineer, with Georgia license tag number BVE 5701, which he believed had a window tint dark enough to justify a traffic stop to check to see if the light transmission was 32 percent or better, in accordance with Georgia law.[6]  [Id. at 6-7]; see also (Gov. Ex. 122-1).  When Officer Sipple saw the vehicle pull out onto the road, he initiated a traffic stop, and asked the driver (later identified as Reyes), see [Doc. 122 at 14], and the passenger (later identified as

_____

[5] Sergeant Restrepo said that he "didn't have any probable cause at that time," and asked if Officer Sipple could "generate [his] own."  [Doc. 122 at 7].

[6] Officer Sipple testified that he had a tint meter assigned to him, but that he did not recall whether he used it to check the tint on the vehicle during the stop. [Doc. 122 at 8, 12].

Payamps) for identification,  [id. at 7-8].  Both Reyes and Payamps handed Officer Sipple Puerto Rico driver's licenses.  [Id. at 7-9]; (Gov. Ex. 122-2).  Officer Sipple conducted a records check on the license given to him by Reyes and found that the license number did not match the address on the license. [Doc. 122 at 8].  He returned to the car and asked Reyes if he had any other identification, and asked him his name, whereupon Reyes gave Officer Sipple three different names and three different dates of birth.  [Id. at 8-9].

Officer Sipple arrested Reyes for providing false names and dates of birth, and Reyes was transported to jail for booking.[7]  [Id. at 10-11].  A woman, later identified as Cordero, came to the scene of the stop, and drove the vehicle away.[8]  [Id. at 11].  Officer Sipple said his conversation with Payamps during the vehicle stop was "fairly brief," and he only asked Payamps how long he had been living in Gwinnett and what his address was, to which Payamps replied that he had been living in Georgia for "a couple of months," and that his address was "off of Oak Lane."  [Id. at 9-10].  Officer

---

[7] Pursuant to O.C.G.A. § 16-10-25, it is a violation to give "a false name, address, or date of birth to a law enforcement officer in the lawful discharge of his official duties with the intent of misleading the officer as to his identity or birthdate."

[8] Officer Sipple testified that he checked Cordero's license before she drove the vehicle away.  [Doc. 122 at 13].

5

Sipple said the "information on [Payamps'] Puerto Rico driver's license matched," though the name on the license was "Alexis Rivera-Pantoja." [Id.]; (Gov. Ex. 122-2).

## C. The July 10, 2009, Traffic Stop

On July 10, 2009, Corporal Kannigiser told Sergeant Restrepo that intercepted calls from the wiretap led him to believe that Cordero and Payamps were arranging a narcotics transaction.[9] [Doc. 122 at 18]. Payamps told Cordero he had gotten "some stuff" that was "a hundred percent to [ninety] percent" from "good contacts." [Id.]. They discussed a price of "27," and Cordero told Payamps that she would "like to get a sample of it to look at it."[10] [Id. at 18, 38]. Sergeant Restrepo testified that the wiretap had been in place for "quite some time" at this point, and that GCPD officers "had . . . intercepted and obviously developed sufficient probable cause in reference to the conspiracy of ten armed robberies based on the actual phone calls, as well as

_____

[9] Cordero and Payamps were under surveillance by Sergeant Restrepo and other officers as Corporal Kannigiser listened to the wiretapped conversations and relayed information. [Doc. 122 at 19-20, 31-34]. Sergeant Restrepo was receiving information from Corporal Kannigiser as he heard it while listening in on conversations in the wire room. [Id. at 20, 31-32].

[10] Sergeant Restrepo testified that the GCPD officers listening to the wiretap had learned the jargon used by Payamps and Cordero when discussing narcotics. [Doc. 122 at 19]. For example, they would refer to "paloma" when speaking about a kilogram of cocaine. [Id.]. He testified that on June 10, 2009, "it was clear they were talking about drugs, specifically cocaine or a kilo." [Id.].

surveillance that [they] had placed on these individuals and . . . the trackers that [were] on their cars."  [Id. at 18-19].

After being alerted to the possibility of a drug transaction in progress, surveillance officers watched Payamps, who was riding in the front passenger seat of a black Acura MDX sport utility vehicle ("the Acura"), see [id. at 52]; (Gov. Exs. 122-4-5), driven by Hernandez-Garcia, arrive at Cordero's residence,  [Doc. 122 at 20-21]. Garcia-Gomez was in the rear passenger seat.  [Id. at 20-21, 32].  Payamps, Hernandez-Garcia, and Garcia-Gomez got out of the Acura and went into Cordero's house.[11]  [Id. at 21].  At this time, Garcia-Gomez was carrying a "very shiny gold" bag that appeared to the surveillance officers to be "kind of flat" and empty.  [Id.];  see also (Gov. Exs. 122-5 & 122-6).  The surveillance team watched Payamps, Hernandez-Garcia, and Garcia-Gomez leave Cordero's house some time later carrying the same gold bag, which at this time appeared "very full," and "looked like it was heavy and that

---

[11] GCPD Sergeant Thomas Bartik ("Sergeant Bartik"), who had been employed by GCPD for 22 years and, on the day in question, was assigned to take charge of the stop of the vehicle in which Payamps was riding, testified that the surveillance officers saw a white van pull up to Cordero's house, a single individual get out and walk inside carrying a gold bag, which appeared empty, and while that individual was inside, the Acura pulled up and two individuals got out and went inside the house.  [Doc. 122 at 47-49, 50-51, 61].  He then testified, as Sergeant Restrepo did, that all three individuals left Cordero's house with an apparently full bag and got in the Acura before driving away.  [Id.].  However, Sergeant Bartik said that he did not directly observe any of the defendants coming or going from Cordero's house, and only knew what other officers were describing over the radio.  [Id. at 61].

obviously there was something inside." [Doc. 122 at 21-22, 50]. The three men got back into the Acura, sitting in the same seats as before, and drove away. [Id. at 22, 50]. At this point, Sergeant Restrepo decided to stop the vehicle because he believed that there were illegal drugs inside the vehicle.[12] [Id. at 22].

Even though Sergeant Restrepo had decided to stop the Acura, he made the tactical decision to follow it to an area where it was safe to make a high-risk stop. See [id. at 23]. Sergeant Bartik, Sergeant Restrepo, Detective Andy Rodriguez ("Detective Rodriguez"),[13] other surveillance team officers, and several uniformed officers made the stop adjacent to a Publix parking lot where all three occupants were taken out of the car at gunpoint and handcuffed. [Id. at 23-25, 51-52, 54-55, 68]. Because this location was approximately a mile away from Cordero's house, and because he received information that Zapata was enroute to Cordero's house, Sergeant Restrepo decided to walk the detained defendants (Payamps, Hernandez-Garcia, and Garcia-Gomez) to a more secluded location in a BB&T Bank parking lot adjacent to the

---

[12] Sergeant Restrepo testified that he also thought Garcia-Gomez might be in some danger of being robbed or kidnapped by Hernandez-Garcia and Payamps based on intercepted communications between Cordero and Garcia-Gomez's wife, who suspected that Garcia-Gomez was having an affair. See [Doc. 122 at 23-24, 32]. Sergeant Restrepo testified that in one of the intercepted calls, Garcia-Gomez's wife was heard whispering, "They're here. They're counting money. You need to come now," and talked about "wanting him to get hurt." [Id. at 37].

[13] Detective Rodriguez testified that he had been with GCPD since 2007, and was assigned to the Homicide/Assault unit. [Doc. 122 at 66].

location of the initial stop in order to minimize the chances that Zapata would see the stop and be alerted.[14]  [Id. at 24-25, 54-55, 68-69].  Another officer also moved the Acura to this spot, where it was searched by Sergeant Bartik.  [Id. at 54-55].  Sergeant Bartik found a gold bag on the back seat that contained a purse, approximately $29,000 in cash, a package taped with brown tape containing a substance that tested positive for cocaine, and Santeria candles.  [Id. at 38, 55-56];  see also (Gov. Exs. 122-6–122-9).

Detective Rodriguez advised Payamps in Spanish of his Miranda[15] rights while he was detained in the BB&T Bank parking lot.[16]  [Doc. 122 at 26, 41, 56].  Detective Rodriguez testified that Payamps appeared to understand those rights as verbally recited by Detective Rodriguez, and after Payamps was transported to GCPD headquarters, Detective Rodriguez again recited Payamps his rights in Spanish by

---

[14] Sergeant Restrepo testified that the stop of the Acura was part of a larger operation in which Cordero and Reyes were later stopped as well.  [Doc. 122 at 25-26].  Cordero's vehicle was later pulled over in the very same parking lot where the Acura was first stopped.  [Id. at 26].

[15] Miranda v. Arizona, 384 U.S. 436 (1966).

[16] Sergeant Bartik testified that Payamps was seated in a police vehicle with his hands cuffed in the front at this time.  [Doc. 122 at 62].  Detective Rodriguez testified that Payamps was seated on a curb while handcuffed.  [Id. at 69].  Detective Rodriguez testified that he told Payamps in Spanish that "he had the right to remain silent, that anything he . . . said could and was going to be against him in a court of law, that he had the right to have an attorney present while he was being questioned, that if he could not afford one, that one was going to be provided to him at no cost, and that any time he could exercise those rights and not talk to me or ask – or basically not make any statements or answer any of my questions."  [Id. at 70].

reading from a GCPD form.   [Id. at 70, 80]; (Gov. Ex. 122-10).   After Detective

Rodriguez had finished advising Payamps of his rights at the BB&T Bank parking lot,

Sergeant Bartik asked Payamps if he would cooperate with the investigation.[17]  [Doc.

122 at 58].  Payamps said that he would, and Detective Rodriguez and Sergeant Bartik

drove Payamps in an undercover vehicle as Payamps directed them to two "stash

house[s]."[18]  [Id. at 27, 43, 58, 63, 71-72].  Thereafter, Payamps was transported to GCPD

headquarters.  [Id. at 74].

**D.  Interview of Payamps**

When Payamps arrived at GCPD headquarters, he was placed among a group

of other suspects who had just been arrested, and Detective Rodriguez advised the

group of their Miranda rights by reading from a Spanish language version of a GCPD

---

[17] Sergeant Bartik spoke to Payamps in English, and Sergeant Bartik testified
that Payamps appeared to understand and speak English with few difficulties.
[Doc. 122 at 57-59].  Detective Rodriguez testified that Payamps "spoke English good
enough to have conversations with both of us at the same time, and I didn't have to
translate or anything like that."  [Id. at 74].

[18] Sergeant Bartik drove the vehicle with Payamps in the front passenger seat,
telling him where to go.  [Doc. 122 at 58].  Detective Rodriguez sat in the back seat,
and spoke to Payamps in Spanish at times.  [Id.].  At no time after the Miranda
warnings or during the trip to the stash houses did the officers draw their guns on
Payamps, use physical force, or threaten him.  [Id. at 59, 73].  Sergeant Bartik
testified that the stash house locations were already known to the officers involved
in the investigation, and that Payamps "confirmed locations we were already
familiar with."  [Id. at 63].  Detective Rodriguez testified that Payamps' manner
during the car ride was "very relaxed, just having conversation," and that at no time
did he ever ask to stop, or ask for an attorney.  [Id. at 73].

Miranda form.  [Doc. 122 at 74-75, 80-81]; (Gov. Ex. 122-10).  Subsequently, Sergeant

Restrepo and Detective Rodriguez interviewed Payamps in an interview room at GCPS

headquarters.  [Doc. 122 at 28].  Sergeant Restrepo asked Detective Rodriguez if

Payamps had been informed of his constitutional rights, and Detective Rodriguez

confirmed that Payamps had been.  [Id. at 28, 41-42].  Sergeant Restrepo then asked

Payamps if he was "clear on [his] rights," and if Detective Rodriguez had "discuss[ed]

his rights with [him]" and Payamps said "yeah."  [Id.].  Payamps was interviewed

from approximately 5:00 p.m. on July 10 until 8:30 a.m. on July 11, 2009, with bathroom

and meal breaks and "a lot of down time," during some of which Payamps slept.[19]  [Id.

at 29, 42]; (Gov. Ex. 122-3)  During the course of the interview, at no point did any of

the interviewing officers threaten Payamps, display a weapon, use force, or make any

_____

[19] Sergeant Restrepo explained that it took a long time to coordinate the
interviews of the eight suspects who had been arrested, and that Payamps was one
of the last to be interviewed due to his level of cooperation.  [Doc. 122 at 42-43].  He
said that Payamps was "being moved room to room as we needed the interview
rooms . . . [for] processing the other people, getting the paperwork, getting the
warrants."  [Id. at 44].  During this time, Sergeant Restrepo said that Payamps
appeared alert and aware of what was going on, except for being groggy when the
interrogating officers would wake him up.  [Id. at 45].  At no time did Payamps say
he wished to stop the questioning or that he needed to sleep.  [Id. at 46].

promises.[20]  [Doc. 122 at 29-30, 59-60, 76].  Payamps agreed to answer questions and at

no time requested an attorney or asked to stop the interview.  [Id. at 76-77].

**E.  Search of Espinoza-Manon's Residence**

On July 10, 2009, Investigators Joel Carrasco ("Investigator Carrasco") and

Gregory Behlmann ("Investigator Behlman"), of the GCPD[21] went to a residence

located at 1806 Nichols Ferry Court in Lawrenceville, Georgia, ("the residence")[22] to

assist with the narcotics investigation headed up by Corporal Kannigiser.  [Doc. 113

at 4-5, 27-28].  Corporal Kannigiser told Investigator Behlmann to go to the residence

to conduct a "knock-and-talk" after another investigator had determined the residence

to be associated with a larger methamphetamine investigation under way at that time.

[Id. at 6, 14-15, 27-28, 40].  Investigator Carrasco was present to assist as a Spanish

interpreter.  [Id. at 4-5].

_____

[20] Sergeant Bartik testified that "Investigator Marion" told Payamps that if he provided information, it would be forwarded to the District Attorney on his behalf. [Doc. 122 at 60].

[21] Investigator Carrasco testified that he was a narcotics investigator, and that he had worked for GCPD for three and a half years.  [Doc. 113 at 4].  Investigator Carrasco is fluent in Spanish.  [Id.. at 5].  Investigator Behlmann testified that he was assigned to the special investigations section at GCPD, specifically to narcotics cases.  [Id. at 27].  He testified he had worked for GCPD for eight years, the past four of which had been in narcotics.  [Id.]

[22] Investigator Behlmann described the residence as a two-story, single family dwelling with a garage on the left-hand side with a driveway, and a walkway leading from the driveway to the front door.  [Doc. 113 at 29].

Investigators Behlmann and Corrasco arrived at the residence between 6:00 and 7:30 p.m. and knocked on the front door.   [Id. at 6-7, 29-30].   Neither of the investigators were dressed in uniform, but both were armed and wearing markings that identified them as police officers.[23]   [Id. at 15-16, 41].   No other officers were present with the investigators at the front door of the residence, though at least two other officers were present in the area in a surveillance role and as backup.[24]   [Id. at 15, 18-19, 55-56].   A woman, later identified as Espinoza-Manon, answered the door, and Investigators Behlmann and Carrasco identified themselves as GCPD police officers. [Id. at 7, 30].   Through Investigator Carrasco, Investigator Behlmann explained to Espinoza-Manon that they were at the residence because of a drug investigation, and

_____

[23] Investigator Carrasco testified that he was wearing "plain clothes" with his firearm on his waist, concealed by his shirt, and was holding his badge in his hand. [Doc. 113 at 15-16].  Investigator Behlman testified that he was wearing a ballistic vest with the word "police" on the front, and had his firearm in a thigh-holster.  [Id. at 31, 41].

[24] Investigator Carrasco testified that other officers were present nearby "down the street," but that these officers remained out of sight of the front door during the initial contact with Espinoza-Manon.  [Doc. 113 at 18-19].  Investigator Behlmann testified that two surveillance officers were parked down the street away from the house, but with a line of sight to the front door.  [Id. at 50-51].  He also testified that "some of the surveillance guys may have walked over on the edge of the driveway" while Investigators Carrasco and Behlmann waited on the front porch for Espinoza-Manon to return to the door after their initial contact with her.  [Id. at 32].  All of the officers present, including the investigators, were driving unmarked police vehicles, which they parked 150 or 200 feet from the residence.  [Id. at 50-51].  Investigator Behlmann testified that there were only two such vehicles parked within potential view of the front door of the residence.  [Id. at 55-56].

13

asked if they could come in and search for drugs.[25]  [Id. at 7, 16-17, 30].  Espinoza-Manon said that she would "feel more comfortable if she [could] call somebody because she had kids inside the house," and asked the investigators to wait.  [Id. at 8, 17, 31-32].  The investigators told Espinoza-Manon that this would be okay, and Espinoza-Manon closed the door, leaving the investigators outside.  [Id. at 8, 31-32].

The investigators waited outside the front door of the residence for Espinoza-Manon to return, and while they waited, they could see through a large window with damaged blinds that she was moving about the interior of the house.  [Id. at 8-10, 32].  Espinoza-Manon returned and opened the door approximately twenty minutes later, and told the investigators that her friend was not there yet, but that they could come in and search.  [Id. at 10, 33].  At this time, Espinoza-Manon appeared "sweaty," "out of breath," and "nervous," but she did not appear aggressive or angry.  [Id. at 10, 33].  Espinoza-Manon stepped out of the doorway to allow the investigators to enter, and Investigator Carrasco remained standing with Espinoza-Manon in the living room of

_____

[25] Investigator Carrasco acted as a Spanish translator for Investigator Behlmann because Espinoza-Manon appeared to not understand Investigator Behlmann, who was speaking English. [Doc. 113 at 7-8, 30].  Investigator Behlmann testified that he is not fluent in Spanish, and therefore used Investigator Carrasco as a translator.  [Id. at 30].  The investigators testified that when they asked for permission to search, they did not threaten Espinoza-Manon, draw their weapons, make any promises, or engage in any coercion to gain her cooperation.  [Id. at 8-9, 31].  The investigators also did not explain that she had a right to refuse to consent to a search, nor did they ask her to read or sign a consent-to-search form.  [Id. at 19-20].

the house while Investigator Behlmann conducted a five-minute cursory search of the residence. [Id. at 10, 21-22, 33-34]. Investigator Carrasco testified that Espinoza-Manon sat on the couch while he remained standing nearby, and her demeanor appeared "friendly" and not upset. [Id. at 11-12]. He said that he told her that they were doing a "drug investigation," but made no further conversation, and Espinoza-Manon made no other statements. [Id. at 22]. Investigator Carrasco said that at this time, Espinoza-Manon was free to leave at any time. [Id.].

Investigator Behlmann went into the kitchen where he noticed water on the floor and wet plastic bags in the trash can. [Id. at 34]. He then proceeded into the garage, where he saw a large roll of cellophane wrap and "MSM," which he knew to be a common chemical used to "cut" methamphetamine. [Id. at 34-35]. Investigator Behlmann also located a cooler in the corner of the garage containing a dark liquid that he believed, based on his training and experience, to be liquid methamphetamine. [Id. at 35]. After Investigator Behlmann used a field test kit to obtain a positive result for methamphetamine from a sample of the liquid, he decided to get a search warrant for the residence, and contacted "Investigator Carani" at GCPD to prepare the application and obtain the warrant. [Id. at 12, 23-24, 35-36]; (Gov. Ex. 113-2). Investigator Behlmann then returned to the living room and told Investigator Carrasco that he had found what he suspected to be methamphetamine and that he was going to get a

search warrant, whereupon Investigator Carrasco relayed to Espinoza-Manon that they had found narcotics, and the investigators were going to secure the residence while they got the warrant.  [Doc. 113 at 23].  The investigators waited in the living room with Espinoza-Manon for the search warrant to arrive at the residence, which took approximately one hour.  [Id. at 24, 36]. During this time, after the investigators told Espinoza-Manon that they were waiting for a search warrant, she appeared "upset," but at no time asked the investigators to leave, and at no time asked for a lawyer.[26] [Id. at 13, 37].  After the warrant was brought to the residence, the investigators, assisted by other GCPD officers, searched the home and seized methamphetamine, cash, firearms, scales, packaging material, and the "cut."  [Id. at 37-38]; (Gov. Exs. 113-3A-3Q).

## II. DISCUSSION

Payamps moves to suppress all evidence obtained from state wiretaps on grounds that the wiretap orders were illegally obtained.  [Docs. 102, 118, & 139].[27]  He

_____

[26] Investigator Carrasco testified that Espinoza-Manon was not in fact free to leave at this time, and that she remained sitting on the couch as other GCPD officers began to arrive at the residence to assist with securing the residence and with executing the search warrant.  [Doc. 113 at 24-26].

[27] Documents 118 and 139 are substantively the same.  See [Docs. 118 & 139]. Payamps' reply to the government's response to his motion to suppress was refiled to edit a document link. See [Doc. 139].  Thus, this Report and Recommendation will reference only document 139 when referring to Payamps' reply.

additionally seeks to suppress evidence arising from the July 3 and July 10, 2009, traffic stops on grounds that those stops and associated searches were conducted without probable cause.   [Doc. 108; Doc. 133 at 8-16].   Payamps also seeks to suppress statements he made while in custody subsequent to the July 10, 2009, stop on grounds that those statements were obtained in violation of his <u>Miranda</u> rights.  [Doc. 103; Doc. 133 at 16-18].  Espinoza-Manon challenges the government's seizure of evidence from her residence on two grounds: first, that evidence obtained in support of the warrant was the fruit of an illegal "knock-and-talk," and therefore the warrant was tainted and invalid, and second, that Espinoza-Manon did not give valid consent to search her residence.  <u>See</u> [Doc. 129 at 4, 13].

## A.    Validity of Wiretaps

Evidence obtained via a state wiretap is admissible in federal court if the wiretap order is validly issued under state law and in compliance with 18 U.S.C. §  2518.  18 U.S.C. § 2516(2) ("The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State Court of competent jurisdiction for an order authorizing or approving the interception of wire, oral or electronic communication, may apply to such judge in conformity with [18 U.S.C. § 2518] and the applicable State statute.").  Under Georgia law, wiretap orders may be issued "upon

written application, under oath, of the prosecuting attorney having jurisdiction over the prosecution of the crime under investigation, or the Attorney General, made before a judge of superior court" and the wiretap must be consistent with "Chapter 119 of Title 18 of the United States Code Annotated, as amended."  O.C.G.A. § 16-11-64(c). Chapter 119 of Title 18 of the United States Code addresses wiretaps in 18 U.S.C. § 2518, making Georgia's wiretap requirements co-extensive with federal law.

18 U.S.C. § 2518(3) permits a judge to grant a wiretap application if the judge determines on the basis of submitted facts that:

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense . . . ;

> (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

> (c) normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried or to be too dangerous;

> (d) . . .there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commissions of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3)(a)-(d).   A judge evaluating wiretap applications under these standards can consider affidavits, e.g., State v. Barnett, 220 S.E.2d 730, 731-32 (Ga. Ct. App. 1975); Bell v. State, 196 S.E.2d 894, 895 (Ga. Ct. App. 1973), sworn oral testimony, Simmons v. State, 211 S.E.2d 725, 726 (Ga. 1975); Reynolds v. State, 236 S.E.2d 525, 526

18

(Ga. Ct. App. 1977),  and/or verified complaints, O.C.G.A. § 17-5-21; <u>see</u> <u>Barnett</u>, 220 S.E.2d at 732 (acknowledging that "complaint" and "affidavit" are often used interchangeably).  For an affidavit to be sufficient, it must be "sworn to before any notary public, magistrate, judge of any court, or any other officer of the state or county where the oath is made who is authorized . . . to administer oaths."  O.C.G.A.  § 9-10-113.

"To support an order of electronic surveillance, an affidavit must establish, among other things, probable cause to believe that an individual is committing, has committed, or is about to commit certain offenses enumerated in 18 U.S.C. § 2516, and probable cause to believe that communications concerning that offense will be obtained through electronic surveillance."  <u>United States v. Peterson</u>, 627 F. Supp. 2d 1359, 1363 (M.D. Ga. 2008) (citation omitted).  "The probable cause necessary to support a wiretap authorization is the same probable cause necessary for a search warrant."  <u>Id.</u> (citing <u>United States v. Nixon</u>, 918 F.2d 895, 900 (11th Cir. 1990)).   <u>See also</u> <u>United States v. Gonzalez Perez</u>, 283 F. App'x 716, 721 (11th Cir. 2008) (per curium) (unpublished). "Thus, probable cause exists if the totality of the circumstances indicate that there is a fair probability that the sought for evidence will be obtained."  <u>Peterson</u>, 627 F. Supp. at 1363 (citing <u>Illinois v. Gates</u>, 462 U.S. 213, 239 (1983)).   "The probable cause determination of the judge who issued the wiretap order will be upheld if the judge

had a 'substantial basis' for concluding that probable cause existed." Id. (citing Nixon, 918 F.2d at 900).

In addition to these statutory requirements, the Fourth Amendment's prohibition against unreasonable search and seizure requires that warrants be issued by "a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." Johnson v. United States, 333 U.S. 10, 14 (1948); see U.S. CONST. amend. IV. This judicial neutrality interposes a "deliberate, impartial judgment of a judicial officer . . . between the citizen and the police." Wong Sun v. United States, 371 U.S. 471, 481-82 (1963).

In his motion to suppress, Payamps argues that law enforcement's wiretap application failed to include full statements as to whether or not other investigative procedures had been tried and failed, were unlikely to succeed, or were too dangerous. [Doc. 102 at 3]. However, this assertion is not supported by the record. Corporal Kannigiser's affidavit in support of the wiretap application clearly indicates that other investigative procedures were tried and failed. See [Doc. 109-2 at 27-33]. Corporal Kannigiser specifically states how physical surveillance, grand jury subpoenas for witnesses and documents, interviews with confidential informants and cooperating individuals, use of undercover agents, consensual monitoring of conversations, interviews with witnesses or targets, search warrants, consent searches, trash pulls, and

20

obtaining toll records and pen registers would be ineffective to meet the goals of the investigation and describes the extent to which those methods had been used up to that point in the investigation. [Id.]. Corporal Kannigiser's affidavit clearly indicates that based on his experience with narcotics investigations, see [id. at 3-6], these procedures were unlikely to yield further information about the identity of involved individuals and the organization's operating procedures, particularly information about high-level individuals, [id. at 27-33]; see also United States v. Allen, 274 F. App'x 811, 816 (11th Cir. 2008) (per curium) (unpublished) (upholding a wiretap when officer's affidavit asserted that traditional techniques, which had been successful, would not yield information beyond "street-level transactions"). Based on this information, the wiretap application satisfactorily demonstrates that "normal investigative procedures [had] been tried and [had] failed or reasonably appear unlikely to succeed if tried." 18 U.S.C. § 2518(3).

Payamps also argues that the authorization for the order was insufficient on its face and that the application was not submitted to or executed by an impartial judicial officer. [Doc. 102 at 3]. Specifically, Payamps argues that the lack of a notarial seal voids the attempted notarial act of the Honorable Melodie Conner, Superior Court Judge ("Judge Conner"), rendering the supporting affidavit insufficient and the resulting wiretap order invalid on its face. See [Doc. 139 at 3-4]. Payamps also asserts

that by both "accepting the affiant's oath that the affidavit was true and correct" and "act[ing] as the decider to issue the search warrant," Judge Conner engaged in an impermissible conflict of interest that prevented her from acting as a detached, neutral judicial officer.  [Id. at 4-5].  Payamps contends that by administering the oath to the affiant and then signing the order authorizing the wiretap, Judge Conner became a part of the criminal enforcement team and was no longer a neutral and detached judicial officer. [Id.].

Because notarization is not the only means of rendering an affidavit sufficient, the wiretap order is not invalid on its face due to the alleged failed notarization.  See O.C.G.A. § 9-10-113.  As the affidavit was sworn to before a judge, it is sufficient under Georgia law.  Id.  Moreover, merely administering the oath to the affiant of a written wiretap application does not alter a judge's neutrality.  As noted above, judges are permitted to make probable cause determinations based on sworn oral testimony.  See Simmons, 211 S.E.2d at 726; Reynolds, 236 S.E.2d. at 526.  When assessing probable cause using sworn oral testimony, a judge first administers the oath to an affiant and then conducts a detached evaluation to determine whether probable cause has been established by the sworn testimony.  Similarly, here, Judge Conner first administered the oath by witnessing the signing of the affidavit and then issued a search warrant based on her evaluation of the probable cause established by the affidavit.  [Doc. 109,

Exs. 1, 2 & 3]. Performing both these functions does not make the issuing judge an "adjunct to the law enforcement team." [Doc. 139 at 5 (quoting United States v. Leon, 468 U.S. 897, 917 (1984)]; see Beal v. State, 333 S.E.2d 103, 105 (Ga. Ct. App. 1985) (quoting O.C.G.A. § 16-11-64) ("By [notarizing affidavits] the judge merely establishes that the affiant 'swore to and subscribed before him' the contents of the affidavit. We fail to see how this taints the judge's ability to weigh the credibility of the affiant and the facts and circumstances set forth in the affidavit under such oath."); cf. [Docs. 109-1, 109-2 & 109-3], with Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 327 (1979) (town justice not neutral when he was also a vocal member, perhaps even leader, of the search party executing the warrant), and Connally v. Georgia, 429 U.S. 245, 250-51 (1977) (per curium) (justice of the peace who was paid five dollars when a warrant was issued and nothing when it was denied not neutral and detached). Based on the record before the Court, Judge Conner retained the neutrality required by the Fourth Amendment and issued a valid wiretap order supported by a sufficient affidavit.

Payamps next argues that the affidavit forming the basis for the wiretap application failed to establish probable cause. [Doc. 109 at 3]. However, the affidavit supporting the original wiretap application and its amendments clearly establish a "fair probability the sought after evidence [would] be obtained." Peterson, 627 F. Supp. at 1363. Indeed, "[a] drug smuggling conspiracy of wide scope and long

standing is described in some detail, and it is alleged that the telephone[s] sought to be tapped [were] used in furtherance of the conspiracy." United States v. Hyde, 574 F.2d 856, 862 (5th Cir. 1978).[28] Specifically, Corporal Kannigiser's original affidavit described how the investigation began in May 2006, with the investigation of a prostitution ring operating out of various apartment complexes and the Puerto Plata restaurant in Gwinnett County.  [Doc. 109-2 at 12-16].  Corporal Kannigiser described how confidential informants identified "Ada Cordero" as the woman who conducted all the narcotics transactions for the prostitution ring,  see [id. at 16], and how a separate confidential informant also reported that he could get large quantities of cocaine and marijuana at Puerto Plata restaurant from "Ada," who was later positively identified as Cordero, see [id. at 17].   These informants, some of whom had successfully worked with law enforcement in the past, were able to provide phone numbers for Cordero, [id. at 17-18], and indicated that she had also been involved in ordering robberies of drug dealers by a Dominican gang,  [id. at 24].   Subsequent officer surveillance and undercover work by Investigator Cotto confirmed the accuracy of these phone numbers, the fact that Cordero dealt narcotics, and revealed additional phone numbers she used to conduct "business."  [Id. at 20-23].

---

[28] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit.  Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

24

After the initial wiretap, additional phone lines were revealed via Cordero's contact with Investigator Cotto and through confidential informants. [Doc. 109-4]. The intercepted communications also revealed other phone lines involved in the narcotics ring. See [Docs. 109-5 & 109-6]. Many calls coming from and going to these numbers involved terms commonly used in reference to cocaine and methamphetamine. See [Docs. 109-5 ("wanting some cold ones"); Doc. 109-6 ("blonde, green eyed girl which ran at 100," "a virgin," "without any miles")]. Other calls to the additional phone lines arranged robberies, the plans for which were corroborated by physical surveillance. [Doc. 109-6 at 5]. Based on these facts, Corporal Kannigiser's affidavits alleged sufficient facts to establish probable cause that Cordero and others were part of a conspiracy to distribute narcotics and commit robbery and that communications regarding these activities would be intercepted over the subject telephones.

Payamps also argues that some of the wiretap orders were requested, signed, and executed by unauthorized individuals, [Doc. 102 at 4], but these arguments fail. As noted above, Georgia law permits prosecuting attorneys having jurisdiction over the prosecution of the crime under investigation or the Attorney General to request wiretap orders from superior court judges. See O.C.G.A. § 16-11-64(c). The wiretap orders and amendments in this case were requested by Daniel J. Porter, District Attorney for the Gwinnett Judicial Circuit, the "principal prosecuting attorney" of

Gwinnett County, Georgia. [Doc. 109-1 at 2].[29]  Furthermore, the requests were submitted to Judge Conner, a Superior Court Judge in Gwinnett County.[30] [Id. at 12]. Thus, the wiretap orders were both requested by and submitted to an authorized individual in compliance with O.C.G.A. § 16-11-64(c).

Payamps' remaining arguments involve the process by which the wiretaps were executed. [Doc. 102 at 3].  He argues that agents failed to properly minimize communications not subject to interception, and that agents did not intercept communications over the wiretaps in conformance with the wiretap order.[31] [Id.]. However, there is no evidence law enforcement failed to properly minimize interception of communications.  Corporal Kannigiser's affidavit reveals that the officers had a carefully constructed plan regarding how to minimize interception of

---

[29]Although the first motion to amend the wiretap order was applied for by Phil Wiley, not Daniel Porter, he was the Acting District Attorney for the Gwinnett Judicial Circuit at the time.  [Doc. 109-4 at 2].

[30]The first motion to amend the wiretap order was submitted to the Honorable Robert Walker ("Judge Walker"), acting by designation of Judge Conner. [Doc. 109-4 at 2].  Although Judge Walker is a magistrate judge, he is authorized to permanently assist Gwinnett County Superior Court judges in their duties by O.C.G.A § 15-1-9.1(b)(2)(E).  See Cox. v. State, 263 S.E. 2d 238, 242 (Ga. Ct. App. 1979) (wiretap applications presented to Superior Court of Fulton County were authorized by magistrates).

[31] Payamps does not suggest how the government failed to comply with the wiretap order, except to generally allege that they did not sufficiently minimize the interception of unrelated communications.  See [Doc. 102 at 3].

unrelated communications, and how to train and inform those who would be monitoring the wiretap about the minimization requirement and the substance of the wiretap order. See [Doc. 109-3 at 34-35 (describing the planned informational meeting, how individuals not in attendance would be informed, and that each person monitoring the wiretap would sign a form acknowledging their understanding of minimization techniques and the wiretap order)]. Officers would immediately cease monitoring communications that were not between named associates or criminal in nature. [Id. at 35]. Furthermore, a detailed log of the communications was kept and preserved in a secure location, including details of what calls were not monitored and at what point in the communication monitoring ceased. [Id.]. Absent more specific allegations from Payamps, particularly given the existence of the wiretap log, his challenge to the officers' execution of the wiretap has no merit. See United States v. Ortega-Estrada, Criminal File No. 1:07-cr-356, 2008 WL 4716949, at *9 n.8 (N.D. Ga. 2008), adopted at *1 ("[A] failure to minimize claim can not be established simply by alleging there was no minimization."). For all the foregoing reasons, Payamps' motion to suppress the wiretap evidence is due to be denied.

**B.    The July 3, 2009, Traffic Stop**

"The Fourth Amendment protects individuals from unreasonable search and seizure." United States v. Rowls, 402 F. App'x 467, 468 (11th Cir. 2010) (per curiam)

(unpublished) (internal marks and citation omitted).  The "[t]emporary detention of individuals during the stop of an automobile by the police, even if for only a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."  Whren v. United States, 517 U.S. 806, 809-10 (1996) (citations omitted); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001);  United States v. Edenilson-Reyes, Criminal Action File No. 1:09–CR–00361–RWS–AJB, 2010 WL 5620439, at *9 (N.D. Ga. Oct. 26, 2010), adopted by 2011 WL 195679, at *1 (N.D. Ga. Jan. 20, 2011).  A traffic stop is reasonable if the officer has probable cause to believe that a traffic violation has occurred, or if the traffic stop is justified by reasonable suspicion in compliance with Terry v. Ohio, 392 U.S. 1 (1968). Edenilson-Reyes, 2010 WL 5620439, at *9 (citing United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009) (citation omitted)); see also United States v. Monzon-Gomez, 244 F. App'x 954, 959 (11th Cir. 2007) (per curiam) (unpublished); United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999);  United States v. Sierra, Cr. No. 2:10cr183–MEF, 2011 WL 1675217, at *2 (M.D. Ala. Apr. 19, 2011), adopted by 2011 WL 1675180, at *1 (M.D. Ala. May 4, 2011).  Thus, "[a] traffic stop . . . is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion. . . ."  Edenilson-Reyes, 2010 WL 5620439, at *9 (alterations in original) (internal marks and citations omitted); see also United States

v. Boyd, 388 F. App'x 943, 947 (11th Cir. 2010) (per curiam) (unpublished); United States v. Woods, 385 F. App'x 914, 915 (11th Cir. 2010) (per curiam) (unpublished).

An officer's subjective intentions and opinions are irrelevant where the officer has probable cause for the stop. See United States v. Mwangi, Criminal File No. 1:09-CR-107-TWT, 2010 WL 520793, at *3 n.9 (N.D. Ga. Feb. 5, 2010), adopted at *1 (citations omitted); see also United States v. Arango, 396 F. App'x 631, 632-33 (11th Cir. 2010) (per curiam) (unpublished) ("Where objectively reasonable conditions permit a stop, the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.") (internal marks and citation omitted); Miller v. Harget, 458 F.3d 1251, 1260 (11th Cir. 2006) ("It is well-settled that an officer's subjective motivations do not affect whether probable cause existed") (citations omitted); United States v. Jimenez, No. 2:06-cr-74-FtM-29DNF, 2006 WL 2927477, at *2 (M.D. Fla. Oct. 11, 2006) (holding that "an officer's belief that he has probable cause or does not have probable cause is simply not a pertinent factor" in determining whether an arrest is lawful).  Thus, "if the driver of a car has broken a traffic law, no matter how relatively minor, a motion to suppress evidence cannot be based on the argument that the stop was pretextual." United States v. Wright, No. CR210-022, 2010 WL 4967468, at *1 (S.D. Ga. Nov. 5, 2010), adopted by 2010 WL 4967838, at *1 (S.D. Ga. Dec. 1, 2010) (citation omitted).

Payamps asserts that the July 3, 2009, stop of Reyes' vehicle, in which he was a passenger, was not reasonable under the Constitution because  Officer Sipple never made an attempt to test the window tint of the vehicle's windows, revealing that the stop was pretextual.  [Doc. 133 at 9-10].   Payamps also argues that even if the vehicle was lawfully stopped, Officer Sipple had no probable cause related to Payamps to request his identification.  [Id.].

Officer Sipple testified that he initiated a traffic stop of Reyes' vehicle because the window tint on the rear and side windows appeared to be in violation of Georgia law, [Doc. 122 at 5-8], which "was sufficient to lead a reasonable officer to believe that [Reyes] had violated [O.C.G.A.] § 40-8-73.1(b) by operating a motor vehicle with window tinting that exceeded the allowable limits . . . regardless of whether the tinting was actually illegal," United States v. Garcia, 284 F. App'x 791, 793 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted); see also State v. Simmons, 640 S.E.2d 709, 711-12 (Ga. Ct. App. 2006) (suspected illegal tint justified initial traffic stop).  Because Officer Sipple's observation of the vehicle led him to believe that Reyes' windows were tinted in potential violation of Georgia law, he had probable cause to stop the vehicle.

Since Officer Sipple had probable cause to stop Reyes for a traffic offense, his subjective intentions are irrelevant.   Payamps acknowledges that "an officer's motivation in making a traffic stop is not a factor that can be considered in evaluating the constitutional reasonableness of a traffic  stop."  [Doc. 133 at 8 (citing Whren, 517

30

U.S. at 811-16)].  However, he goes on to argue that "Officer Sipple was not concerned about the window tint as he went directly to the driver of the vehicle, asking both the driver and passenger for identification."  [Id. at 9].  This argument is inconsistent with the precedent that "[s]ubjective intentions play no role in . . . probable-cause Fourth Amendment analysis."  Whren, 517 U.S. at 813; see also United States v. Gonzalez, No. 2:09-cr-29-FtM-29SPC, 2009 WL 3230787, at *7 (M.D. Fla. Oct. 2, 2009), adopted at *3 ("Whether or not [the officer] used the tint violation as a pretext to make the traffic stop does not effect the validity of the stop.").   Regardless of Officer Sipple's subjective concerns, his testimony established that he had probable cause to believe that the window tinting on Reyes' vehicle violated Georgia law, which is "all that is necessary to conduct a traffic stop."[32]  United States v. Alvardo, No. 8:10-CR-348-T-30TGW, 2010 WL 5262736, at *5 (M.D. Fla. Nov. 17, 2010), adopted by 2010 WL 526735, at *1 (M.D. Fla. Dec. 17, 2010) (citation omitted); see also United States v. Harrell, 268 F.3d 141, 149 (2d Cir. 2001) (finding that where an objectively reasonable officer would have

---

[32] "Since the Court concludes probable cause supported [Officer Sipple's] decision to stop [Reyes'] vehicle, the stop also was supported by reasonable suspicion, a lesser degree of proof than probable cause."  United States v. Shirley, Criminal Action File No. 1:10-CR-167-JEC/AJB, 2010 WL 5390138, at *5 n.8 (N.D. Ga. Nov. 10, 2010), adopted by 2010 WL 5390133, at *1 (N.D. Ga. Dec. 22, 2010); see also United States v. Johnson, No. CR05-4063-MWB, 2005 WL 2704892, at *7 (N.D. Iowa Oct. 20, 2005) (officer's "observation of the darkly tinted windows on the [vehicle] provided him with at most probable cause and no less than reasonable suspicion to believe that the [vehicle's] windows had an excessive tint, in violation of [state] law, justifying stop of the vehicle.").

suspected that windows on defendant's vehicle were tinted in violation of state law, officers had probable cause to stop the vehicle); United States v. Hudson, No. 09-20672-CR, 2009 WL 3448214, at *6 (S.D. Fla. Oct. 26, 2009), adopted at *2.

Moreover, Officer Sipple's request for identifying information did not violate Payamps' Fourth Amendment rights. Mere requests for identifying information do not implicate the Fourth Amendment. INS v. Delgado, 466 U.S. 210, 216 (1984) (citing Florida v. Royer, 460 U.S. 491 (1983)). However, an individual has a right to refuse requests for identifying information, and cannot be detained for the purpose of determining his identity if he refuses to comply with an officer's request to identify himself. See Brown v. Texas, 443 U.S. 47, 52-53 (1979). In other words, if an individual is asked to provide identifying information while being detained, "the Fourth Amendment imposes a minimal level of objective justification to validate the detention or seizure" beyond the mere request for identifying information. Delgado, 466 U.S. at 216-17 (citing Terry, 392 U.S. at 21).

As discussed above, Payamps' detention was objectively justified under the Fourth Amendment because he was an occupant of a vehicle being validly detained based upon a suspected window tint violation. [Doc. 122 at 5-8]. No particularized suspicion with respect to him as a passenger is required. See Arizona v. Johnson, 555 U.S. 323 (2009) ("[A] lawful investigatory stop [exists] whenever it is lawful for the police to detain an automobile and its occupants pending inquiry into a vehicular

32

violation.  The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity.").  Payamps  was not detained in order to force him to identify himself, nor was he being held until he provided identification.  <u>See</u> <u>Brown</u>, 443 U.S. at 52.  Instead, Payamps was detained because he was a passenger in a vehicle being investigated for window tint violations.  [Doc. 122 at 5-8].   Because Payamps was validly detained as  an occupant of a vehicle involved in a lawful stop, Officer Sipple's request for identifying information did not violate Payamps' Fourth Amendment rights.  <u>See also</u> <u>United States v. McCalla</u>, 286 F. App'x 610, 611 (11th Cir. 2008) (per curium) (unpublished) (describing steps in a lawful vehicle stop for a traffic violation, including asking the passenger for identification); <u>United States v. Tapia</u>, 912 F.2d 1367, 1369 (11th Cir. 1990) (noting without criticism that in a vehicle stop for speeding the passenger produced identification on request).

**C.     The July 10, 2009, Stop, Warrantless Search, and Warrantless Arrest**

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable  . . . subject only to a few specifically established and well-delineated exceptions.'" <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973) (quoting <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967); <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 454-55 (1971)).  In <u>Arizona v. Gant</u>, 556 U.S. 332, 129 S. Ct. 1710 (2009), the Supreme Court "affirmed the viability of the probable cause exception for automobiles." <u>United States v. Goldsmith</u>,

Criminal Action No. 4:09cr94, 2009 WL 4884408, at *3 (E.D. Tex. Dec. 10, 2009), adopted at *1 (citing Gant, 129 S.Ct. at 1719). "Under the automobile exception, agents may conduct a warrantless search of a vehicle if (1) the vehicle is readily mobile (i.e., operational); and (2) agents have probable cause to believe the vehicle contains contraband or evidence of a crime." United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006).[33] "The legality of a warrantless automobile search is based on the existence of probable cause to believe that the automobile is carrying contraband subject to forfeiture under the law, and the difficulties of securing a moveable vehicle while a warrant is obtained." United States v. Thomas, 536 F. Supp. 736, 742 (M.D. Ala. 1982); see also Chambers v. Maroney, 399 U.S. 42, 51-52 (1970); United States v. Alexander, 835 F.2d 1406, 1409 (11th Cir. 1988). The government bears the burden of demonstrating the legality of a warrantless search and arrest. Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); United States v. Tobin, 923 F.2d 1506, 1517 & n.21 (11th Cir. 1991).

Probable cause to search exists "'when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband.'" Alexander, 835 F.2d at 1409 (quoting United States v. Clark, 559 F.2d 420, 424 (5th Cir. 1977)) (alteration in original). Thus, under the automobile exception, a warrantless

---

[33] "[T]he mobility of an automobile is exigency enough," United States v. Nixon, 918 F.2d 895, 903 (11th Cir. 1990), and mobility is satisfied merely if "the automobile is operational," United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) (per curiam).

search of a vehicle does not violate the Fourth Amendment "if the vehicle is operational and 'under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found' in the vehicle." Tamari, 454 F.3d at 1262 (quoting United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002) (internal marks omitted)).

A warrantless arrest requires probable cause under the Fourth Amendment. United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing Michigan v. Summers, 452 U.S. 692, 700 (1981)); see also United States v. Costa, 691 F.2d 1358, 1361 (11th Cir. 1982) (per curiam).  Probable cause exists "when an arrest is 'objectively reasonable based on the totality of the circumstances.'" McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (per curiam) (citation omitted); see also Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998) (citation omitted).  "This standard is met when 'the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" Rankin, 133 F.3d at 1435 (quoting Williamson v. Mills, 65 F.3d 155, 158 (11th Cir. 1995) (per curiam)); see also Beck v. Ohio, 379 U.S. 89, 91 (1964).

Payamps asserts that the July 10, 2009, stop of the Acura, the subsequent warrantless search of the vehicle, and his arrest violated his Fourth Amendment rights

because the officers did not have probable cause to believe that a crime was being committed and no attempt was made to get a warrant. [Doc. 133 at 13]. Specifically, Payamps asserts that no probable cause existed because officers' eyewitness surveillance did not confirm the officers' "anticipated view of what was going to happen." [Id.]. Instead, Payamps argues, the stop and search of the Acura were "undertaken to discover evidence of criminal wrongdoing." [Id. at 14].

Sargeant Restrepo testified that on July 10, 2009, he received information from Corporal Kannigiser that had been intercepted over a wiretap. [Doc. 122 at 18]. This wiretap had been operating for sometime, and the officers had learned about specific "lingo" used between callers. [Id. at 18-19]. On July 10, 2009, the call was between Cordero and Payamps and concerned drugs, specifically a kilo of cocaine. [Id. at 18-19, 38].[34] The conversation revealed that Payamps and Gomez-Garcia would meet Cordero at her residence, bringing a sample of cocaine, and then a subsequent purchase would occur. [Id. at 21, 38]. Sargeant Restrepo alerted the surveillance team of undercover officers, including Dusty Seaton ("Officer Seaton") and Frederick Saldona ("Officer Saldona"). [Id.]. They watched Payamps, Hernandez-Garcia, and Gomez-Garcia get out of a black Acura at Cordero's residence. [Id. at 20-21]. Gomez-Garcia was holding a shiny gold gift bag that looked flat and empty. [Id. at 21]. When Payamps, Hernandez-Garcia, and Gomez-Garcia left the house and got back into the

---

[34] Sargeant Restrepo also testified that they had a "trained" company, A.B.C. Linguistics, identify the voices on the calls. [Doc. 122 at 34-35].

Acura, the bag was very full and appeared to be heavy.  [Id. at 21-22].  Based on the

conversation heard on the wiretap and the officers' observations at Cordero's residence

of the three men and the bag, Sargeant Restrepo made the decision to stop and search

the vehicle.  [Id.].

In this case, all the facts and circumstances known to the officers at the scene

provided the requisite probable cause to justify a warrantless search of the Acura and

subsequent arrest of Payamps.[35]  Based on their monitoring of the wiretap, both

Sargeant Restrepo and Corporal Kannigiser knew that Cordero and Payamps were

discussing a narcotics transaction involving cocaine.  [Id. at 18-19].  Corporal

Kannigiser heard, over this wiretap, that Gomez-Garcia was going to go to Cordero's

residence to conduct a narcotics transaction. [Id.].  Payamps and Gomez-Garcia would

bring the drugs, Cordero could inspect them, and if they were satisfactory, she would

purchase them.  [Id. at 38].  Officers Seaton and Saldona, in communication with

Sargeant Restrepo over the radio, saw Payamps and Gomez-Garcia, along with

Hernandez-Garcia, arrive at Cordero's house as expected from the wiretap

conversation.  [Id. at 21].  They watched Payamps, Gomez-Garcia, and Hernandez-

_____

[35] Sargent Restrepo, Corporal Kannigiser and Officers Seaton and Saldona were all communicating via radio, permitting the Court to examine their knowledge collectively when determining probable cause.  See United States v. Olmedo, 552 F. Supp. 2d 1347, 1357 (S.D. Fla. 2008), adopted at 1350 (stating that a court determining whether probable cause exists "may examine the collective knowledge of the officers 'if they maintained at least a minimal level of communication during their investigation'")(quoting United States v. Willis, 759 F.2d 1486, 1494 (11th Cir. 1985) (citation omitted)).

Garcia enter Cordero's house with an empty bag and saw them exit with a bulky bag. [Id. at 21-22]. Collectively, the officers heard a conversation over the wiretap between Payamps and Cordero describing a drug deal, saw Payamps, Gomez-Garcia and Hernandez-Garcia subsequently arrive at the discussed location, enter the residence with an apparently empty bag, and exit with a bulky, full bag, getting back into the Acura. [Id. at 18-22].

In short, the officers had specific information from the wiretap about the location and participants in the narcotics transaction that was corroborated by surveillance officers. This information would cause a prudent person to believe that Payamps had committed the narcotics transaction discussed on the wiretap, justifying his warrantless arrest. See Rankin, 133 F.3d at 1435. Similarly, this same information would cause a prudent person to believe that the mobile, operational, Acura contained evidence of the narcotics transaction, justifying a warrantless search of the vehicle. Tamari, 454 F.3d at 1262; see also Edenilson-Reyes, 2010 WL 5620439, at *7-8 (probable cause existed when investigators stopped a vehicle to search it for drugs based on conversations that used code words for drugs and discussed logistics of an exchange, physical surveillance of a vehicle involved in that exchange, and prior experience with the suspects' activity to provide context).

Contrary to Payamps' assertions, probable cause is not defeated simply because events did not unfold precisely how the officers anticipated. [Doc. 133 at 13].

Probable cause determinations are made by reviewing the totality of the circumstances. United States v. Gonzalez, 969 F.2d 999, 1002-03 (11th Cir. 1992) (citing Gates, 462 U.S. 213, 233 (1983)).  Based on the wiretap conversations, officers believed Payamps was bringing cocaine to Cordero's residence.  [Doc. 122 at 38].  This wiretap information was partially corroborated when officers conducting surveillance confirmed Payamps and Gomez-Garcia's arrival at the residence.  [Id. at 21].  The wiretap conversation was further corroborated when the officers saw Payamps, Gomez-Garcia, and Hernandez-Garcia leave Cordero's residence with a bulky bag, consistent with the officers' belief that Payamps had dropped off drugs and received a large sum of cash in return.  [Id.]. The only allegedly inconsistent fact was that officers did not see Payamps physically carry the cocaine into the residence.  [Doc. 133 at 13].  Instead, Gomez-Garcia's gold bag appeared empty when the three men entered the house.  See [Doc. 122 at 21]. However, this observation did not directly contradict the wiretap conversation, proving only that the cocaine was not located in Gomez-Garcia's gold bag, not that Payamps did not have any drugs on him.[36]  Because probable cause does not require "overwhelmingly convincing evidence" but only "reasonably trustworthy information," the wiretap conversation and officers' corroborating surveillance were enough to establish a reasonable belief that a crime had occurred and generate

_____

[36] Moreover, Cordero had requested to see a sample of the cocaine, [Doc. 122 at 18, 38], so the fact that surveillance officers did not see Payamps carrying a kilo-sized package into the residence is not inconsistent with the information obtained from the wiretap.

probable cause to justify a  warrantless search and arrest.  See Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996).

Payamps repeatedly asserts that officers should have sought a warrant to search Cordero's home.  See [Doc. 133 at  13, 15].  However, the fact that officers could establish probable cause to serve as the basis for a search warrant for Cordero's home does not change the fact that probable cause also existed with respect to searching the Acura.  Moreover, the search of the Acura and Payamps' arrest are not rendered invalid because the government did not apply for a warrant with respect to these specific actions.  See [id. at 12, 13, 15].  "The relevant test is not whether it is reasonable to procure a search warrant, but whether the search is reasonable."  Cooper v. California, 386 U.S. 58, 59 (1967) (overruled on other grounds).  As discussed above, the search of the Acura and Payamps' subsequent arrest were supported by probable cause rendering the search and arrest reasonable under Fourth Amendment analysis. See Summers, 452 U.S. at 700.

**D.   Payamps' Interview**

"Custody" for purposes of triggering Miranda advisements occurs when "there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)) (internal marks omitted).  Here, Payamps was undoubtedly in custody, having been placed in handcuffs at

gunpoint after being removed from the Acura, then transported by two officers as he directed them to drug house locations before being taken to GCPD headquarters.[37] Therefore, the only issue to be decided is whether Payamps properly waived his Miranda rights prior to being subject to "interrogation."[38]

The government bears the burden of proving by a preponderance of evidence that a defendant validly waived his Miranda rights. United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997); see also Colorado v. Connelly, 479 U.S. 157, 168-69 (1986). Prior to beginning interrogation of a defendant in custody, law enforcement agents must fully advise the defendant of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." Miranda 384 U.S. at 467-70 (acknowledging that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely"); see also J.D.B. v. North Carolina, 131 S. Ct. 2394, 2401 (2011) ("Prior to questioning, a suspect must be warned that he has a right to

---

[37] The government appears to concede the issue of custody, as it states in its brief that "[GCPD] arrested [Payamps] as part of a felony stop of an Acura M.D.X. believed to be carrying illegal drugs." [Doc. 138 at 5].

[38] "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.") (citation and internal marks omitted). Miranda also requires that law enforcement respect the defendant's decision to exercise his rights as outlined in the warnings. 384 U.S. at 473-74. ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.").

A defendant may waive his rights so long as the waiver is knowing, intelligent, and voluntary. Id. at 444; J.D.B. 131 S. Ct. at 2401. This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

United States v. Patterson, No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)); see also Moran v. Burbine, 475 U.S. 412, 421 (1986); Edwards v. Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725 (1979); Schneckloth, 412 U.S. at 226.

42

Whether a waiver of <u>Miranda</u> rights is voluntary "depends on the totality of the circumstances and must be evaluated on a case-by-case basis."   <u>United States v. Vanbrackle</u>, 397 F. App'x 557, 562 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted).  "No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances." <u>Patterson</u>, 2007 WL 2331080, at *3.  "Among the factors [the Court] consider[s] are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." <u>Vanbrackle</u>, 397 F. App'x at 562 (citation and internal marks omitted).  However, a signed, written waiver of <u>Miranda</u> rights is strong proof of the validity of the waiver. <u>Id.</u>; <u>United States v. Stephens</u>, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002).  To find a waiver involuntary, "coercive police activity is a necessary predicate." <u>Connelly</u>, 479 U.S. at 167.

Payamps argues that his statements obtained "[d]uring . . . more than twelve hours of interrogation" overnight in which he "was not offered an opportunity to get a formal meal of any sort, . . . [and] not allowed to sleep on a normal bed but had to use the floor to sleep between interrogations," were not voluntary due to the coercive environment to which he was subjected.  [Doc. 133 at 17].  In support of this contention, Payamps cites <u>Blackburn v. Alabama</u>, 361 U.S. 199 (1960), in which a mentally ill

robbery suspect confessed after being interrogated for eight or nine hours in a four by six or six by eight foot room by as many as three officers.  Id. at 204.  While the circumstances as to the size of the room, number of officers, and the length of interrogation are similar to the circumstances in the instant case, other key factors present in Blackburn were absent here.[39]  The Blackburn Court observed that "[a] prolonged interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of friends and relatives is not infrequently an effective technique of terror."  361 U.S. at 206.  However, in this case, Payamps was not ignorant of his rights, having been advised of those rights prior to being questioned. Additionally, there is no evidence Payamps was mentally ill, which was a critical factor in the Court's analysis of the voluntariness of the Blackburn defendant's confession. See id. at 207 ("[T]he evidence indisputably establishes the strongest probability that Blackburn was insane and incompetent at the time he allegedly confessed.").

Payamps also argues that as an illegal alien in the United States for less than a year and with no criminal record, he was unfamiliar with the laws and procedure of American police.  [Doc. 133 at 17].  Additionally, he asserts that he was "more likely to feel coerced by police tactics" given the reputation of Mexican police.  [Id.].  While Payamps' knowledge of police procedure and familiarity with American law is

---

[39] Moreover, the Blackburn decisions preceded the Miranda decision by six years, and therefore is of little precedential value in analyzing the voluntariness of Payamps' statements under Miranda and its progeny.

relevant, it is not dispositive, and it is merely one factor in the totality of circumstances to be considered.  To the extent he may have been unfamiliar with his rights, the two Miranda advisements given in Spanish by Detective Rodriguez served to inform Payamps of his relevant rights under the American legal system, and Payamps twice indicated that he understood these rights.  See United States v. Castaneda-Castaneda, 729 F.2d 1360, 1362 (11th Cir. 1984) (Miranda waiver by Columbian nationals voluntary where "[t]hey were read the rights in their native tongue and all questioning was conducted in that language"); see also United States v. Shi, 525 F.3d 709, 730 (9th Cir. 2008) (finding Chinese national's confession voluntary despite his arrest being the first contact with United States law enforcement where he "was read his rights by an interpreter who maintained a '90 to 95 percent' level of understanding with him," signed a written waiver printed in his native language, and he "told the agents he understood the form.") (citing United States v. Gamez, 301 F.3d 1138, 1144-45 (9th Cir. 2002); United States v. Amano, 229 F.3d 801, 804-05 (9th Cir. 2000)).

In other respects, the environment in which Payamps was placed was not unduly coercive.  After his initial arrest at gunpoint, Payamps was not subjected to violence or threats of violence, and though he was confined, he was allowed a meal break, bathroom breaks, and was allowed to sleep. [Doc. 122 at 29, 42]. Payamps twice indicated that he understood his rights, [id. at 28, 41-42], and in all ways appeared to voluntarily cooperate with Detective Rodriguez and Sergeant Bartik's investigation.

He led them to two stash houses prior to being transported to the police station, during which time Detective Rodriguez described the tone of conversation between Payamps and the officers as "very relaxed."   [Id. at 27, 43, 58, 63, 71-73].   Thereafter, though Payamps was detained for a relatively lengthy period of time into the night, he was not subjected to sustained interrogation.   Rather, there was "a lot of down time" for Payamps as police attempted to piece together a large investigation in a short period of time.   [Id. at 29, 42-44]. At no time did Payamps say that he did not wish to speak, that he wanted a lawyer, or that he wanted to sleep rather than talk to investigators. [Id. at 76-77].   Based on these facts, Payamps statements to investigators were voluntary and his motion to suppress is due to be denied.

**E.      Validity of "Knock-and-Talk" at the Residence**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.  However, a consensual "knock and talk" interaction with a suspect at her home does not violate the Fourth Amendment.  See United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006) ("The Fourth Amendment, which prohibits unreasonable searches and seizures by the government, is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises . . . officers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the

46

inhabitants just as any private citizen may.") (internal marks and citations omitted);

United States v. Benitez-Garcia, 1:08-cr-437-WSD-JFK, 2009 U.S. Dist. LEXIS 45354, at

*8-9 (N.D. Ga. May 29, 2009) (holding same).

Espinoza-Manon challenges the validity of the investigator's "knock-and-talk"

strategy by reading the language of Taylor to imply that, where officers approach a

suspect's door with the intent of asking for consent to search, any search thereafter is

tainted.  See [Doc. 129 at 5 ("'The Fourth Amendment . . . is not implicated by entry

upon private land to knock on a citizen's door for legitimate police purposes

**unconnected with a search of the premises**.'") (quoting Taylor, 458 F.3d at 1201)

(emphasis added)].  The investigators' testimony clearly establishes that their purpose

in knocking on the door of the residence was to ask the occupant for consent to search.

See [Doc. 113 at 6, 28, 40].  However, Taylor does not logically require the outcome

Espinoza-Manon insists upon,[40] and furthermore, the Supreme Court has

---

[40] Though Espinosa-Manon cites the quote from Taylor to suggest that an officer knocking at a suspect's door with the sole intent of asking for consent to search implicates the Fourth Amendment, this was not Taylor's holding.  Rather, Taylor only states that officers knocking on a door *without* this intent are acting within Constitutional limits, which does not necessarily mean that officers knocking on doors *with* such an intent are outside of those limits.  Espinoza-Manon cites three Eleventh Circuit cases following Taylor to the extent they restate the quoted language Espinoza-Manon relies on, but none of these cases interpret Taylor to prohibit officers from knocking on a door with the intention of asking for consent to search the premises.  See United States v. Cha, Nos. 09–14916, 09–15042, 2011 WL 2438943, at *5 (11th Cir. June 20, 2011) (per curiam) (unpublished); Coffin v. Brandau, 642 F.3d 999, 1012 (11th Cir. 2011); United States v. Cox, 391 F. App'x 756, 758 (11th Cir. 2010) (per curiam) (unpublished).  Espinoza-Manon cites no authority directly supporting the proposition that "[l]aw enforcement's use of the 'knock and

acknowledged the lawfulness of police knocking on a person's door to seek consent to search the premises.

In <u>Kentucky v. King</u>, 131 S. Ct. 1849 (2011), the Court reiterated the principle that "officers may seek consent-based encounters if they are lawfully present in the place where the consensual encounter occurs.  If consent is freely given, it makes no difference that an officer may have approached the person with the hope or expectation of obtaining consent."  <u>Id.</u> at 1858 (citing <u>Delgado</u>, 466 U.S. at 217 n.5).  The Court went on to explain with regard to the practice of knocking on a suspect's door "either to speak with an occupant or to obtain consent to search,"

> the police may wish to speak with the occupants of a dwelling before deciding whether it is worthwhile to seek authorization for a search. They may think that a short and simple conversation may obviate the need to apply for and execute a warrant.  Second, the police may want to ask an occupant of the premises for consent to search because doing so is simpler, faster, and less burdensome than applying for a warrant. A consensual search also "may result in considerably less inconvenience" and embarrassment to the occupants than a search conducted pursuant to a warrant.  Third, law enforcement officers may wish to obtain more evidence before submitting what might otherwise be considered a marginal warrant application. Fourth, prosecutors may wish to wait until they acquire evidence that can justify a search that is broader in scope than the search that a judicial officer is likely to authorize based on the evidence then available. And finally, in many cases, law enforcement may not want to execute a search that will disclose the existence of an investigation because doing so may interfere with the acquisition of additional evidence against those already under suspicion or evidence about additional but as yet unknown participants in a criminal scheme.

<u>Id.</u> at 1860 (citing <u>Schneckloth</u>, 412 U.S. at 228).  The Court then observed:

---

talk' as a sole pretext for asking for consent to search is expressly forbidden by . . . <u>Taylor</u>."  [Doc. 129 at 6].

> When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak. . . . even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.

Id. at 1862 (citations omitted).  Accordingly, no matter what their intentions were, the investigators did not violate any of Espinoza-Manon's Fourth Amendment rights by merely knocking on her front door in order to speak with her, which was something any member of the public could have done considering that the door was located at the front of the house and freely accessible by walking up the driveway and walkway from the street.[41]  See id.  The only remaining question is whether the investigators validly

_____

[41] Espinoza-Manon also argues, without any directly supporting authority, that officers must have "a reasonable articulable suspicion of criminal activity" at a residence before knocking on the door to ask for consent to search.  [Doc. 129 at 11].  Espinoza-Manon has not cited, and this Court is not aware of, any authority requiring that officers have articulable reasonable suspicion prior to initiating a consensual contact or asking for consent to search.  Furthermore, the United States Supreme Court has stated that "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search . . ., as long as the police do not convey a message that compliance with their requests is required," which is directly contrary to the position Espinoza-Manon urges the Court to adopt. Florida v.  Bostick, 501 U.S. 429, 434-35 (1991).  Espinoza-Manon also argues that the investigators were not lawfully at the front door of the residence because they had no reasonable suspicion of criminal activity inside; see [Doc. 129 at 11-13], however, nothing in the facts suggests that any Fourth Amendment protections should be afforded to the area in front of the residence's front door, which was not protected from intrusion or view in any way, and was visible from the street from a distance of as much as 200 feet (the location where the investigators and surveilling officers

obtained Espinoza-Manon's consent to enter and search the residence.

**F.     Espinoza-Manon's Consent**

As previously discussed a search conducted without a warrant issued upon

probable cause is unreasonable, unless it falls under a specifically established exception

to the warrant requirement. <u>Schneckloth</u>, 412 U.S. at 219. "One of the well-established

exceptions to the probable cause and warrant requirements is a search which is

conducted pursuant to voluntary consent." <u>United States v. Garcia</u>, 890 F.2d 355, 360

(11th Cir. 1989); <u>see also</u> <u>Schneckloth</u>, 412 U.S. at 219; <u>United States v. Reynolds</u>, 526

F. Supp. 2d 1330, 1336 (N.D. Ga. 2004). A person may consent to a search of a residence

so long as the consent is voluntary and the person has authority to grant consent. <u>See</u>

<u>United States v. Dooley</u>, Criminal Action No. 2:09–CR–00016–WCO, 2011 WL 2162687,

at *4 (N.D. Ga. June 2, 2011) (citing <u>Garcia</u>, 890 F.2d at 360; <u>United States v. Chemaly</u>,

741 F.2d 1346, 1352 (11th Cir. 1984)); <u>United States v.  Acosta</u>, Criminal Case No.

1:09–CR–184–JEC, 2011 WL 2401829, at *9 (N.D. Ga. June 13, 2011), adopted at *1

(citations omitted).

"In order for consent to a search to be deemed voluntary, it must be the product

of an essentially free and unconstrained choice."     <u>Garcia</u>, 890 F.2d at 360.

---

had parked their vehicles). <u>See</u> <u>United States v. Williams</u>, No. CR410-224, 2011 WL
765728, at *2 (S.D. Ga. Jan. 12, 2011), adopted by 2011 WL 892367 (S.D. Ga. Mar. 11,
2011).    Thus, the investigators violated none of Espinoza-Manon's Fourth
Amendment rights by merely approaching her front door and speaking with her
while standing outside. <u>Id.</u>

Voluntariness of consent is judged in light of the totality of the circumstances.  United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995).  Relevant factors include the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of her right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found.  Purcell, 236 F.3d at 1281.  Ultimately, the burden is on the government to prove that the consent given was voluntary.  United States v. Bentley, 151 F. App'x 824, 827 (11th Cir. 2005) (per curiam) (unpublished) (citing Chemaly, 741 F.2d at 1352); Tovar-Rico, 61 F.3d at 1536 (citing Royer, 460 U.S. at 497); United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989).  Here, the totality of circumstances show that Espinoza-Manon freely and voluntarily consented to a search of her residence.

When contacting Espinoza-Manon, the investigators identified themselves as police and informed her that they were there to investigate narcotics activity, but they did not draw their weapons, did not threaten any action, and did not act in any way that was coercive.[42]  See [Doc. 113 at 7, 16-17, 30].  Indeed, they parked their unmarked vehicles away from the front of the residence, and though other officers were present in the area, they were not in sight when the investigators contacted Espinoza-Manon. [Id. at 18-19, 50-51]. Upon the investigators asking her for consent to search, Espinoza-

---

[42] Espinoza-Manon does not cite any coercive action or behavior by the law enforcement officers involved, and instead challenges the validity of consent by focusing on the government's burden of proof.  See [Doc. 129 at 13-14].

Manon told them she would prefer to call someone first, and asked them to wait. [Id. at 8, 17, 31-32].   She then closed the door and left them waiting outside for approximately twenty minutes.   [Id. at 10, 33].   This action shows both that she understood what the investigators were asking and that she did not feel as though she could not object or otherwise not cooperate with the investigators.

During the time the investigators were waiting outside, they did not knock on the door, shout commands, demand entry, or take any other action that might make Espinoza-Manon feel as though she could not simply leave the investigators waiting outside indefinitely; they simply stood there waiting.   [Id. at 8-10, 32].   When she returned to the door, Espinoza-Manon opened it, told the investigators that her friend was not there yet, but that they could come in and search, and then stepped out of the doorway to allow the investigators to enter.   [Id. at 10, 33-34]; cf. United States v. Ramirez-Chilel, 289 F.3d 744, 746-47, 751-52 (11th Cir. 2002) (consent valid where defendant "answered the door; [the officer] spoke to [defendant] in Spanish to request admittance 'in order to determine whether or not there was any evidence of counterfeit documents or counterfeit immigration documents at that residence; [defendant] then 'yield [ed] the right-of-way' to the officers and thus consented to their entry into the home") (footnote omitted).   Espinoza-Manon remained unrestrained, either physically, or by command or show of force by either of the investigators, and sat on the couch across from where Investigator Carrasco was standing while Investigator Behlmann

conducted a search of the kitchen and garage areas that lasted only approximately five minutes. [Doc. 113 at 10, 21-22, 33-34]. Under these circumstances, Espinoza-Manon's consent was entirely voluntary and uncoerced.

Espinoza-Manon argues that the investigators never advised her of her right to refuse consent, however, such an advisement is not necessary, and the lack of it does not render consent involuntary. United States v. Zapata, 180 F.3d 1237, 1241-42 (11th Cir. 1999). Espinoza-Manon also contends that the government has failed to establish by a preponderance of the evidence that her consent was voluntary because Investigator Carrasco did not seem to remember the exact words he said to Espinoza-Manon, and the exact responses she gave, nor did the investigators have her sign a consent-to-search form. See [Doc. 129 at 13-15]. The undersigned finds that, despite Investigator Carrasco's inability to repeat verbatim from memory the statements he made to Espinoza-Manon or what her responses were, his testimony along with the testimony of Investigator Behlmann more than sufficiently showed that Espinoza-Manon gave valid, voluntary consent to the investigators' request to search the residence.[43] Thus, Espinoza-Manon's motion to suppress is due to be denied.

---

[43] Additionally, a consent-to-search form, while valuable evidence to show valid consent, is not necessary. See, e.g. United States v. Edwards, Criminal Action File No. 1:10-CR-132-RWS/AJB, 2010 WL 5184784, at *5 (N.D. Ga. Oct. 13, 2010) (collecting cases), adopted by 2010 WL 5276983, at *1 (N.D. Ga. Dec. 15, 2010).

## III. CONCLUSION

For the foregoing reasons and cited authority, it is **RECOMMENDED** that Payamps' and Espinoza-Manon's motions to suppress evidence and statements, [Docs. 89, 90, 102, 103, & 108], be **DENIED** and that Cordero's motion to suppress, [Doc. 57], be deemed **ABANDONED** and **DENIED**. There are no other matters pending before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case. **IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 13th day of September, 2011.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

54